**DAVIS TRUST CO. et al. v. HARDEE et al.**

No. 6626.

United States Court of Appeals for the District of Columbia.

Argued May 7, 8, 1936.

Decided June 29, 1936.

Leo A. Rover and George B. Fraser, both of Washington, D. C., for appellants.

George B. Barse, Huston Thompson, Herbert S. Ward, Roger J. Whiteford, and P. H. Marshall, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Appellants, plaintiffs below, filed their bill of complaint in the lower court March 6, 1935, alleging that they were owners of a large number of shares of the capital stock of the Federal-American National Bank & Trust Company, a banking association formerly doing business in the District of Columbia, and that the Comptroller of the Currency, who had taken charge of the bank, had made a 100 per cent. assessment against the stockholders. The bill sought to restrain temporarily the

enforcement of the assessment and alleged:

1. That on March 14, 1933, the defendant John Poole was appointed by the Comptroller conservator of the bank;[1]

2. That Poole on the 1st day of September, 1933, filed as conservator a petition in the Supreme Court of the District of Columbia showing that he had entered into a contract with defendant Hamilton National Bank to sell and transfer to it certain quick assets of the Federal Bank, including certain furniture and fixtures, for a total sum of $4,420,422.19. Such quick assets, so far as the same consisted of marketable securities, were to be sold at current market value as of the date of transfer and delivery; and so far as the same consisted of bills receivable, at face value and interest. (Furniture and fixtures at an appraised value).

The petition of the conservator was filed as an exhibit with the bill and shows that, in asking for an order approving the proposed sale, the conservator reported to the court that he believed the proposed sale to be for the best interests of the depositors and creditors of the Federal Bank "in that said sale realizes the full value of said assets in cash and is without sacrifice of any of the interests of said depositors and creditors, and furthermore said sale will enable petitioner to accelerate the time of making payment and distribution to the depositors and creditors" of the bank.

On September 7, 1933, an order was entered by the Supreme Court of the District approving the contract, and the sale and delivery of the assets were made accordingly.

On November 6, 1933, the bank was declared insolvent by the Comptroller, and Cary A. Hardee was appointed receiver; and on July 5, 1934, an assessment of 100 per cent. on the stock of the bank was made, and the receiver by direction of the Comptroller brought suit to recover the amount of the assessments.

Appellants assert that there was no authority under the Bank Conservation Act or any of the applicable statutes for the sale of the bank's assets by the conservator and, in addition, that the terms of the sale were unfair to the Federal Bank and to its creditors and stockholders. Appellants, however, do not ask that the contract be set aside or rescinded, but only that the Comptroller and the Hamilton Bank be required to render an accounting and that upon an accounting, the receiver (who has succeeded the conservator) be required to bring appropriate suits—and in the meantime that a temporary injunction issue restraining the receiver from doing any act or thing to collect the assessments. Appellants' position seems to be that the Bank Conservation Act does not give authority to the conservator to sell, but that the design and purpose of the act was to conserve and preserve the status quo until in good time the bank could work out its own destiny.

We are unable to accept this interpretation of the act. Its language is plain and leads, we think, necessarily to the conclusion that it was the intent of Congress to give to the conservator, under the direction of the Comptroller, precisely the power exercised in this case. Section 203 of the act (12 U.S.C.A. § 203) provides for the appointment of a conservator by the Comptroller "whenever he shall deem it necessary in order to conserve the assets of any bank for the benefit of the depositors and other creditors thereof"; and the conservator, under the direction of the Comptroller, is authorized to take possession of the books and assets of the bank and to have and exercise "all the rights, powers, and privileges now possessed by or hereafter given receivers of insolvent national banks." And also provides that during the-time the conservator is in possession "the rights of all parties with respect thereto shall, * * * be the same as if a receiver had been appointed therefor." Section 206 (12 U.S.C.A. § 206) authorizes the Comptroller to require the conservator to make available for withdrawal by depositors and for payment to other creditors on a ratable basis, such amounts as in the opinion of the Comptroller may be safely used for this purpose.

■ The act was passed March 9, 1933. Just prior thereto practically all the banks in the country had been closed, and the aim and object of the act, as appears from its language, was, we think, to enable the Comptroller to appoint conservators rather than receivers where, in his judgment, there was a prospect that the bank of which a conservator should be appointed might, under his direction and control, later reopen and resume its corporate functions.

---

[1] Bank Conservation Act, March 9, 1933, 48 Stat. 2, 12 U.S.C.A. § 201 et seq.

It was an act designed to secure the temporary control, under the direction of the Comptroller, of all banks suspected of being insolvent, but as to which the situation was not so hopeless as then to require the appointment of a receiver. The conservator was to function during the test or probationary period, but during such period the status of the bank was to be the same as if a receiver had been appointed, which of course means that the withdrawals of deposits were forbidden, except as the Comptroller should authorize, and the ordinary business of the bank suspended. In this instance six months elapsed, and the Comptroller, in the exercise of the power given him to make available for withdrawal by depositors so much of the funds of the bank as in his opinion could be safely used for that purpose, directed the conservator to exercise the powers of a receiver[2] with which he was clothed by the express provisions of the Conservation Act, for the purpose of converting into cash and disbursing to depositors so much of the assets as would be equal to 50 per cent. of the deposits.

 It is, of course, admitted that a receiver has the right and power to sell the real and personal property of the bank for the purpose of paying the debts of the bank; and since, as we have pointed out, the Conservation Act specifically gives the conservator, without reservation, the same power and the same right, it would be necessary to read into the act something else than what is to be found there in order to deny this power to the conservator acting under the direction and instruction of the Comptroller. There is, therefore, no substance in the argument made by appellants that "conservation" contemplates only "retaining intact."

 Here no charge of fraud in the sale is made. On the contrary, it is disclaimed by appellants. All that is alleged is that the sale was unfair to the stockholders of the closed bank because it did not take into consideration the possibility of future enhancement in the value of securities sold. This charge is too fantastic to notice. The provisions of the statute providing for the sale of assets of an insolvent bank were followed in all respects. The terms of the proposed sale were specifically set forth in the conservator's petition to the court and in the contract submitted to and approved by the judge. The sale was made with the approval and at the direction of the Comptroller; and the terms of the contract completely disprove the statement that it was unfair and, on the contrary, show the conservator on behalf of the closed bank received every dollar of the then reasonably obtainable value of principal and interest of the assets sold. The finding, therefore, of the judge that the sale was in the best interests of the depositors and creditors was not only true but must be accepted as conclusive of the question. Fifer v. Williams (C.C.A.) 5 F.(2d) 286, 287.

In this view the lower court was clearly right in declining to enjoin the collection of the assessments. The Comptroller had decided that the bank was insolvent and that an assessment was necessary to pay its debts. His decision is final, and is not subject to collateral attack or open to review except for fraud. Liberty Nat. Bank v. McIntosh (C.C.A.) 16 F.(2d) 906.

Other grounds are alleged in support of the main purpose of the bill, but these grounds were not pressed in argument, and we shall only notice them briefly One is that the Comptroller at the time of sale had intimated there would be no necessity for the statutory assessment on the stock; another, that the real estate of the bank had been under-appraised. No notice of these need be taken. Another, that the closed bank had an asset in its goodwill which had been taken over by the Hamilton Bank and for which the latter should pay; another, that the payments made to depositors within thirty days of the closing of the bank should be recovered because the withdrawals were at the instance or suggestion of some of the officers of the association; still another, that a claim exists in behalf of the bank against some unnamed departments of the government on account of the payment to them of 100

---

[2] Rev. Stat., § 5234 (Act of May 15, 1916, c. 121, 39 Stat. 121, 12 U.S.C.A. § 192) provides that the receiver of an insolvent national bank "under the direction of the comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct."

per cent. of their deposits—secured by collateral of the bank unlawfully exacted, and sold by the conservator or receiver in order to pay the deposits in full.

■ Assuming that such claims exist and that their successful prosecution will reduce the stockholders' liability, it does not follow that they may be asserted against the validity of the stock-assessment made by the Comptroller; for, as we have already seen, his decision in this regard is not subject to collateral attack. But over and beyond all of this, it is perfectly obvious that such claims as can be and should be made for the recovery of the bank's assets are claims which may not be brought by a stockholder but which must be asserted in the name of the receiver. As was said in Kennedy v. Gibson, 8 Wall. 498, 506, 19 L.Ed. 476: "The receiver is the statutory assignee of the association, and is the proper party to institute all suits; they may be brought both at law and in equity, in his name, or in the name of the association for his use. He represents both the creditors and the association, and when he sues in his own name it is not necessary to make either a party to the suit."

If for any reason the receiver is disqualified because of some wrongful act, then in that case the association is the proper party plaintiff. The appointment of the receiver does not terminate the corporate existence of the association or destroy its legal capacity to sue and be sued; and the stockholder has no right to proceed in his own name to assert a right of the association even where the benefits will inure ultimately to himself. An exception, it is true, exists in those cases where on demand the association refuses to act for its own protection and for the protection of its stockholders. But that is not this case.

■ Here the bill fails to show that any demand of any kind has been made on the receiver or on the Comptroller or on the association, and no wrongdoing or negligence is alleged against any of them which would avoid the necessity of demand. The recently decided case of O'Connor v. Rhodes, 65 App.D.C. 21, 79 F.(2d) 146, is an instance where the receiver, by reason of his active participation in an illegal payment to certain government departments, was held to have lost his right to object to a creditor's suit to recover such payment. And if in this case it should develop, upon an inspection of the books of the association (to which the stockholders are entitled for good cause shown and on reasonable notice to the receiver[3]), that preferential payments have been made to certain depositors and that the receiver on notice and request refuses to take steps to collect the amounts, the association itself may institute and maintain such a suit. But without demand first on the receiver and then on the association and the refusal of both, a stockholder may not assume the position of the receiver or the association and act independently of the one or the other. In re Chetwood, 165 U.S. 443, 17 S.Ct. 385, 41 L.Ed. 782; Moss v. Goodhart (D.C.) 209 F. 102.

■ Here, as we have seen, there was no demand on the receiver for an inspection of the association's books or for information in relation to any of the matters alleged; nor any demand that action be taken to recover on account of any of the asserted claims. In these circumstances, the charges as made are without merit, and the action of the lower court in dismissing the bill was wholly correct.

Affirmed.

---

3 Wittnebel v. Longhman (C.C.A.) 80 F.(2d) 222.